**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

_____

JIMMY SKINDILIAS FAMILY TRUST          :
12235 Avenue Martin                    :
Montreal, Quebec, H4K 2B8              :
                                       :
    and                :
                                       :
MAVRA TOUFIDIS                         :
12235 Avenue Martin                    :
Montreal, Quebec, H4K 2B8              :
                                       :
    and                :
                                       :
JIMMY SKINDILIAS                       :
12235 Avenue Martin                    :
Montreal, Quebec, H4K 2B8              :
                                       :
    Plaintiffs,         :      CIVIL ACTION
    v.                  :      NO.
                                       :
EGGSPECTATION RESTAURANTS, LLC         :
8600 LaSalle Road, Suite 615           :
Towson, MD 21286                       :
                                       :
    and                :
                                       :
ENZO RENDA FAMILY TRUST                :
133 Donnaconna Dollard-des-Ormeaux     :
Montreal, Quebec, H9B 3J8              :
                                       :
    and                :
                                       :
CASTRENZE RENDA                        :
1570 rue St. Timothy, Apt. 809         :
Montreal, Quebec, H2I 3N9             :
                                       :
    and                :
                                       :
9218 7905 QUEBEC INC.                  :
7960 rue St. Denis, 1st Floor          :
Montreal, Quebec H2R 2G1              :
                                       :
    and                :

DIMITRIOUS BAGIOTAS                      :
7795 Boulevard Gouin Quest               :
Montreal, Quebec H4K 2M5                 :
                                         :
          and                            :
                                         :
9215 5704 QUEBEC INC.                    :
7960 rue St. Denis, 1st Floor :
Montreal, Quebec H2R 2G1                 :
                                         :
          and                            :
                                         :
PRADEEP K. ANAND                         :
7960 Rue St. Denis, 1st Floor :
Montreal, Quebec H2R 2G1                 :
                                         :
          and                            :
                                         :
9300 2616 QUEBEC INC.                    :
7960 Rue St. Denis, 1st Floor :
Montreal, Quebec H2R 2G1                 :
                                         :
          and                            :
                                         :
PAVLO PLAITIS                            :
7960 rue St. Denis, 1st Floor :
Montreal, Quebec H2R 2G1                 :
                                         :
          and                            :
                                         :
9185 5189 QUEBEC INC.                    :
7960 rue St. Denis, 1st Floor :
Montreal, Quebec H2R 2G1                 :
                                         :
          and                            :
                                         :
GEORGE KORONIS                           :
4540 Hutchinson                          :
Montreal, Quebec H2V 3Z9                 :
                                         :
          and                            :
                                         :
GROUPE GMO                               :
100-1221 Mackay Street                   :
Montreal, Quebec H3G 2H5                 :

```
                                              :
            and                               :
                                              :
LUCIANO GIRLANDO                              :
100-1221 Mackay Street                        :
Montreal, Quebec H3G 2H5                      :
                                              :
      Defendants.                             :
_____      :
```

## VERIFIED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

Plaintiffs, Jimmy Skindilias Family Trust (the "Skindilias Trust"), Mavra Toufidis and Jimmy Skindilias ("Skindilias"), by their undersigned counsel, hereby sue Defendants, Eggspectation Restaurants, LLC (along with its predecessors, "Eggspectation"), Enzo Renda Family Trust (the "Renda Trust"), Castrenze Renda ("Renda"), 9218 7905 Quebec Inc. ("9218"), Dimitrious Bagiotas ("Bagiotas"), 9215 5704 Quebec Inc. ("9215"), Pradeep K. Anand ("Anand"), 9300 2616 Quebec Inc. ("9300"), Pavlo Plaitis ("Plaitis"), 9185 5189 Quebec Inc. ("9185"), George Koronis ("Koronis"), Groupe GMO ("GMO") and Luciano Girlando ("Girlando"), and state as follows:

## THE PARTIES

1.      Plaintiff, the Skindilias Trust, is a duly constituted family trust under the laws of Quebec. For substantially all of the relevant events described herein, the Skindilias Trust was the holder of a 30.3750% Membership Interest in Eggspectation USA General Partnership, a Quebec general partnership (the "Partnership"), and then subsequently in Eggspectation, a Maryland limited liability company.

2.      Plaintiff, Mavra Toufidis, a resident of Quebec, is a Trustee and a Beneficiary of the Skindilias Trust.

3

3.      Plaintiff, Skindilias, a resident of Quebec, is a Trustee and a Beneficiary of the Skindilias Trust. In addition, Skindilias previously acted as a founder, Officer and Director of both the Partnership and Eggspectation.

4.      Defendant, Eggspectation, is a Maryland limited liability company which is in the business of acting as the franchisor to the United States based restaurants operating under the Eggspectation brand. It was also contemplated by Eggspectation's founders that Eggspectation would eventually be the franchisor to all Eggspectation restaurants worldwide, except for those operating in Canada and India. Previously, Eggspectation also operated under the names Eggspectation USA, LLC and Eggspectation Restaurants LLC before merging with and into Eggs Merger, LLC ("Eggs Merger"). As part of and contemporaneously with the merger, Eggs Merger changed its name to Eggspectation Restaurants, LLC.

5.      Defendant, the Renda Trust, is a duly constituted family trust under the laws of Quebec. For substantially all of the relevant events described herein, the Renda Trust was the holder of a 36.1900% Membership Interest in the Partnership and then subsequently in Eggspectation. Acting in concert with 9218, 9215, 9300, 9185 and GMO (collectively, together with the Renda Trust, the "Controlling Eggspectation Members"), the Renda Trust selected Eggspectation's Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

6.      Defendant, Renda, a resident of Quebec, is both a Trustee of the Renda Trust and a Director of Eggspectation. As a controlling stockholder of an entity which was Member of the majority interest group of Eggspectation and as a Director of Eggspectation, he oversaw Eggspectation's operations and was responsible for authorizing its actions.

7.      Defendant, 9218, is a Quebec corporation. Since 2010, 9218 and the other Controlling Eggspectation Members have controlled a majority interest in Eggspectation. Acting in concert with the other Controlling Eggspectation Members, 9218 selected Eggspectation's Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

8.      Defendant, Bagiotas, a resident of Quebec, is a controlling stockholder of 9218, a Director of Eggspectation since December 28, 2012 and has worked as an accountant for all of the Canadian entities described herein, as well as for all the Directors of Eggspectation personally. As a controlling stockholder of an entity which was Member of the majority interest group of Eggspectation, he oversaw Eggspectation's operations and was responsible for authorizing its actions. As an accountant working for many of the individuals and entities described herein, he has been heavily involved in the calculation of financial data and the movement of Eggspectation's assets.

9.      Defendant, 9215, is a Quebec corporation. Since 2010, 9215 and the other Controlling Eggspectation Members have controlled a majority interest in Eggspectation. Acting in concert with the other Controlling Eggspectation Members, 9215 selected Eggspectation's Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

10.     Defendant, Anand, a resident of Quebec, is an Officer of 9215, a Director of Eggspectation and a controller of the Canadian entities described herein. As a Controlling stockholder of an entity which was Member of the majority interest group of Eggspectation, he oversaw Eggspectation's operations and was responsible for authorizing its actions. As a

Controller for many of the entities described herein, he has been heavily involved in the calculation of financial data and the movement of company assets.

11.     Defendant, 9300, is a Quebec corporation. Since 2010, 9300 and the other Controlling Eggspectation Members have controlled a majority interest in Eggspectation. Acting in concert with the other Controlling Eggspectation Members, 9300 selected Eggspectation's Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

12.     Defendant, Plaitis, a resident of Quebec, is an Officer of 9300 and related to Renda as a brother-in-law. As a controlling stockholder of an entity which was Member of the majority interest group of Eggspectation, he was responsible for authorizing the actions of Eggspectation.

13.     Defendant, 9185, is a Quebec corporation. Since 2010, 9185 and the other Controlling Eggspectation Members have controlled a majority interest in Eggspectation. Acting in concert with the other Controlling Eggspectation Members, 9185 selected Eggspectation's Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

14.     Defendant, Koronis, a resident of Quebec, is an Officer of 9185. As an Officer of a majority stockholder and an Officer of a Director of Eggspectation, he was responsible for authorizing the actions of Eggspectation.

15.     Defendant, Groupe GMO, a Quebec corporation owned principally by Olivano Gottardi, was the holder of a 29.25% Membership Interest of Eggspectation until March 20, 2013 when its interest in Eggspectation was purchased. Acting in concert with the other Controlling Eggspectation Members through March 20, 2013, GMO selected Eggspectation's

Directors and Officers, and directly and indirectly controlled Eggspectation, its Directors, Officers and employees.

16.     Defendant, Girlando, a resident of Quebec, is an Officer of Groupe GMO and was a Director of Eggspectation from December 28, 2012 till the sale of GMO's interest in Eggspectation on March 20, 2013. As a Director of Eggspectation, he oversaw Eggspectation's operations and was responsible for authorizing its actions.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, which provides for original jurisdiction in civil cases where the amount in controversy exceeds Seventy Five Thousand Dollars ($75,000) and there exists diversity of citizenship.

18.     Venue is proper in this District pursuant 28 U.S.C. § 1391 because Eggspectation is located in Maryland and a substantial part of that property that is the subject of this action is situated in Maryland.

## FACTUAL BACKGROUND

19.     On May 27, 2004, by entering into that certain General Partnership Agreement (the "Partnership Agreement"), the Skindilias Trust, along with Renda and GMO, founded the Partnership for the purposes of holding assets of Eggspectation. As one of the three founders of the Partnership, the Skindilias Trust was awarded a 33.75% interest in the Partnership. Management of the Partnership was handled jointly by Renda and Skindilias. GMO existed as a silent partner until it took steps to have its interest in the Partnership purchased by the Controlling Eggspectation Members  in late 2012.

20.     On May 28, 2004, the Skindilias Trust and the Renda Trust caused the Articles of Organization of Eggspectation to be prepared, executed and filed with the Maryland Department

of Assessment and Taxation. The Partnership was the sole member of Eggspectation. In accordance with that certain Operating Agreement, dated May 28, 2012, all worldwide intellectual property rights, excluding those intellectual property rights for Canada and India, related to the brand name "Eggspectation" were registered to Eggspectation.

21.     In 2010, Anand, Bagiotas and Koronis, acting through their respective organizations, 9215, 9218 and 9185, were collectively awarded a 10% interest in the Partnership as part of a capital raise wherein 9215, 9218 and 9185 purchased the right to 50% of the royalties collected by Eggspectation's Canadian equivalent from the Canadian franchisees. The sale to 9215, 9218 and 9185 was done in conjunction with a concurrent transaction where Skindilias and Renda sold personal interests in a Canadian franchise for $450,000 and transferred the profits of that sale to Eggspectation for the purposes of recapitalizing Eggspectation.

22.     Immediately following the 9215, 9218 and 9185 purchases, the Skindilias Trust held 30.375% of the Partnership, the Renda Trust held 30.375%, GMO held 29.25% and 9215, 9218 and 9185 collectively held 10%.

23.     On or about November 1, 2012, Renda, acting on behalf of Anand, contacted Mr. David L. Cahn of Whiteford, Taylor & Preston L.L.P. ("Cahn") inquiring about, among other things, the governance provisions of the Partnership and Eggspectation. The inquiry stemmed from Renda's desire to ultimately limit Skindilias' governance of the business after disagreements had arisen among Skindilias and the Controlling Eggspectation Members. One such disagreement concerned an offer to purchase the company for $4,500,000 by Jon Hinkle ("Hinkle"), CEO of Mid-Atlantic Eateries, Inc. ("MAE"), an Eggspectation franchisee, in 2012. Skindilias believed that the offer proposed by Hinkle was a fair price and worth accepting while the other interest holders disagreed. Another disagreement between the interest holders was

8

related to the potential inclusion in the franchise of a Mexico-based investor that did not have experience running a restaurant business. The Controlling Eggspectation Members were inclined to let any investor, restaurant experience or no, join the franchise, whereas Skindilias believed that this franchisee did not meet any of the criteria listed in Eggspectation's franchising documents.

24.     On or about December 28, 2012, a series of resolutions were adopted by the Controlling Eggspectation Members giving effect to the sale of GMO's entire 29.25% ownership in the Partnership for approximately $1,000,000, the removal of Skindilias as a Director of Eggspectation, the termination of Skindilias' employment as an Officer of Eggspectation and the appointment of Bagiotas and Girlando as Directors of Eggspectation where Girlando was to remain a Director for the duration of the sale process. At the meeting, it was made clear to Skindilias that it was the intent of the Controlling Eggspectation Members to "control him" through the freeze-out. Furthermore, this led to increased tensions between Eggspectation and some its franchisees given that Skindilias was perceived as the only remaining party with relevant restaurant management experience.

25.     Subsequent to December 28, 2012, the Controlling Eggspectation Members began removing assets from Eggspectation, thereby significantly devaluing the entity for the purpose of leaching the value from the Skindilias Trust' equity position in the Partnership. Among these transactions was the transfer of Eggspectation's exclusive worldwide intellectual property rights in the Eggspectation brand, excluding the rights for use of Eggspectation intellectual property in the United States, India and Mexico, to 8399999 Canada Inc., an entity controlled by the Controlling Eggspectation Members, on January 1, 2013 in exchange for 80% of Eggspectation's net profits. This action was a significant deviation from anything previously discussed while

Skindilias was involved in the management of Eggspectation. The Skindilias Trust was not notified of the creation of any new entities or the transfer of assets from Eggspectation until after such transfers had occurred. Specifically, Iin the case of the 8399999 Canada Inc. transaction, the Skindilias Trust was notified in 2014, over a year after the effective date. Through these clandestine transfers, the money which Skindilias and the Skindilias Trust had invested in Eggspectation, along with profits from the sale of property and royalties from the franchisees, was removed from Eggspectation and distributed among organizations set up and controlled by the Controlling Eggspectation Members and their respective interest holders. There have also been indications that the Controlling Eggspectation Members' respective affiliates are being used to artificially offset profits realized by Eggspectation through the issuance of friendly loans to Eggspectation. The accruement of expenses and interest associated with these loans appears to be completely discretionary and indicative of their non-genuine nature.

26.     Witnessing this devaluation and being acutely aware of intent of the Controlling Eggspectation Members to pursue their own personal gain at the expense of the minority and the the business, the Skindilias Trust sought to recover the remainder of the assets it had in the Partnership by sending a letter to Renda and GMO on or about February 21, 2013 advising them that the Skindilias Trust had decided to voluntarily withdraw from the Partnership. The February 21, 2013 letter described that pursuant to paragraph 9.1 of the Partnership Agreement, which provided that "the partnership shall be deemed to commence as of the date hereof and shall continue until is dissolved and its affairs are wound up, upon the occurrence of the following events: A) *the voluntary withdrawal from the Partnership upon thirty (30) days' notice by any Partner* or the expulsion, bankruptcy or dissolution of either Partner or upon the occurrence of any other even which terminates the continued status of any Partner as a Partner; B) the

agreement of all the Partners to dissolve the Partnership; or C) dissolution of the Partnership by operation of law," (emphasis added)  the Partnership should be subsequently dissolved.

27.    On or about March 11, 2013, the Skindilias Trust received notice of a Partnership meeting scheduled for March 19, 2013. The notice innocuously stated that the purpose of the meeting was to discus the "distribution of assets." The Skindilias Trust attended the meeting under the assumption the that the meeting was being held to address the Skindilias Trust's  exit from the Partnership and the Partnership's dissolution.

28.    On March 19, 2013, Skindilias attended the above referenced Partnership meeting where, much to his surprise, it was resolved by the Limited Partners excluding the Skindilias Trust that "the proposition to transfer all the shares of Eggspectation belonging to the Partnership to each partner of the Partnership in proportion to their participation in the Partnership was approved by a majority of partners representing a majority of the ownership of the Partnership amounting to 66.292%." The affect of the meeting was to eliminate any right to a distribution of assets that the Skindilias Trust would have had under the Partnership Agreement and leave the Skindilias Trust with no contractual means of recovering its investment in Eggspectation.

29.    On March 20, 2013 the sale of GMO's Membership Interest in Eggspectation was completed.

30.    During July and August of 2013, Skindilias grew increasingly troubled about management of Eggspectation and the apparent intent of the Controlling Eggspectation Members to remove Eggspectation's assets for their personal gain. Eventually, Skindilias contacted the company's counsel, Cahn, and the company's auditors, Grandizio, Wilkins, Little & Matthews ("Grandizio"), to express these concerns. No significant action followed.

31.     On or about August 25, 2013, the Skindilias Trust sought to avail itself through legal means by filing suit against Eggspectation, its Members, and GMO in the Superior Court of the Province of Quebec, demanding that the court enforce the terms of the Partnership Agreement and liquidate the company. The suit was subsequently dismissed on the grounds that the court did not have the power to enforce terms of a partnership agreement where the partnership's interests had been transferred to a limited liability company and that partnership had ceased to exist. The Superior Court suggested that the Skindilias Trust bring suit in the United States.

32.     On or about September 16, 2013, it was announced that 8400113 Canada, Inc., and entity controlled by the Controlling Eggspectation Members. and Eggs Arabia Limited would enter into a Master Franchise Agreement. This was the first time that the Skindilias Trust had heard of either of these entities. As was the case with many of the actions taken by the Controlling Eggspectation Members after Skindilias was effectively frozen-out on December 28, 2012, this decision was a significant deviation from previously discussed plans which would otherwise have brought capital into Eggspectation. It had been previously contemplated that this transaction would be a simple sale of Eggspectation's intellectual property for $200,000. The plan that was ultimately executed, however, was designed to keep assets away from Eggspectation and in turn, prevent the Skindilias Trust from realizing any benefit from the transaction.

33.     In March 2014, Skindilias, acting on behalf of the Skindilias Trust, reached out to the auditors of Eggspectation to repeat concerns about the questionable actions of Eggspectation, its Directors and the Controlling Eggspectation Members. Again, the auditors failed to assist the Skindilias Trust in what had become an increasingly oppressive environment,

but the concerns raised by Skindilias were sufficient to warrant their refusal to continue their engagement with Eggspectation.

34.     On April 23, 2014, the Skindilias Trust received notice that on May 6, 2014, there would be a meeting of the Members of Eggspectation to approve the merger offer of Eggs Merger wherein, Eggs Merger, an entity comprised of all the Members of Eggspectation except the Skindilias Trust, would be the surviving entity and the Skindilias Trust, unable to raise any objection to the terms of the squeeze-out merger, would be forced to sell its 30.375% membership interest for $254,000 with $25,400 payable in 30 days of the closing and the remainder in the form of an 8% Promissory Note payable over 36 months (the "Merger"). This offer was based upon a valuation of Eggspectation for only $836,213.99. Among the data that was absent from the valuation were two recently developed franchise locations in Maryland and Brooklyn and the $1,000,000 buy-out of GMO's 29.25% Membership Interest.

35.     Subsequent to receiving the notice of the May 6, 2014 Member meeting, Skindilias, through counsel, contacted Eggspectation to request various documents related to the company's valuation and GMO's buyout.

36.     As a result of the steps taken by Skindilias to look into the valuation of Eggspectation, on or about, May 5, 2014, Cahn informed the Skindilias Trust that the Directors of Eggspectation had elected to postpone the Member meeting till on or about June 6, 2014. Cahn explained that the previous valuation of Eggspectation had not considered using the information from sale of GMO's interests and that the Directors wished to revisit the matter.

37.     Over the course of June 2014, the Member meeting was repeatedly delayed.

38.     On or about, June 27, 2014, Cahn informed Skindilias that the value of Eggspectation had been reassessed at $1,028,000.

39.     On or about July 9, 2014, the Skindilias Trust was notified that Eggs Merger had revised its merger offer and that the terms of the revised merger proposed that the Skindilias Trust would be paid $31,225.50 upon closing and $281,029.50 payable over 43 months pursuant to an 8% Promissory Note (the "Revised Merger").

40.     On July 7, 2014, the Skindilias Trust, acting in good faith upon the expressed desires of Eggspectation to negotiate a mutually agreed to buy-out of the Skindilias Trust's interest, sent a letter to Eggspectation, proposing that if the Controlling Eggspectation Members believed that the June 27, 2014 appraisal was accurate and fair, the Skindilias Trust would be willing to purchase their collective 69.625% interest in Eggspectation at the $1,028,000 valuation for $715,745.

41.     On or about July 17, 2014, Eggs Merger submitted a proposal to MAE to purchase five Eggspectation restaurants for $8,000,000, 6.5 times the restaurants' combined 2013 earnings before interest, depreciation and amortization, with $4,000,000 paid upon closing and the remainder payable over a 5 year period at 6% interest.

42.     In response to Eggspectation's request for additional information, on July 24, 2014, the Skindilias Trust sent further correspondence offering the members $210,000 in cash at an accelerated closing date with the balance to be paid out in monthly installments over a 30 month period or alternately, $715,745 in cash at a closing to occur 45 to 60 days from the date of acceptance.

43.     On July 25, 2014, the Skindilias Trust received notification that the meeting of the Members originally scheduled for May 6, 2014 to consider the terms of the Revised Merger was to occur on August 8, 2014. At that point, given that schedule of the meeting indicated the vote

to approve the Revised Merger would occur before consideration or the Skindilias Trust proposals, it was clear that the Skindilias Trust's offers were not being seriously considered.

44.     Between July 25, 2014 and August 1, 2014, the Skindilias Trust attempted to negotiate the terms of a buyout of its interest in Eggspectation without success.

45.     On or about August 1, 2014, the Skindilias Trust, recognizing that the Controlling Eggspectation Members were unlikely to take a reasonable approach to negotiations, notified Eggspectation in writing that, pursuant to Section 4A-705 of the Maryland Limited Liability Company Act and Section 3-202 of the Maryland Code of Corporations and Associations, the Skindilias Trust was exercising its statutory right to demand and receive payment of the fair value of the Skindilias Trust's Membership Interest in Eggspectation from Eggs Merger.

46.     On August 8, 2014, the Controlling Eggspectation Members approved the Directors' decision to execute the Revised Merger and then, not surprisingly, rejected the offers made by the Skindilias Trust. The Skindilias Trust did not vote to approve the Revised Merger, but it made little difference given the merger itself was a manifestation of the minority interest holder oppression orchestrated by the Controlling Eggspectation Members.

47.     On August 8, 2014, the Directors of Eggspectation caused the Articles of Amendment / Name Change of Eggspectation to be prepared, executed and filed with the Maryland Department of Assessment and Taxation to effect the merger of Eggspectation with and into Eggs Merger and the change of the surviving entity's name to Eggspectation Restaurants, LLC.

48.     On August 11, 2014, the Articles of Amendment / Name Change of Eggspectation was accepted by the Maryland Department of Assessment and Taxation.

49.     On August 28, 2014, the Skindilias Trust, pursuant to Section 3-203 of the Maryland Code of Corporations and Associations, delivered a formal written demand to the successor entity of the Revised Merger, Eggspectation, for fair value of the full amount of Class B Interests held by the Skindilias Trust, representing a 30.375% Member Interest in Eggspectation.

50.     As of the date of this Complaint, the Skindilias Trust has received no response from Eggspectation regarding the August 28, 2014 demand.

## COUNT I

### (Petition for Appraisal)

51.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

52.     The Skindilias Trust has made several substantial investments in the capitalization of Eggspectation during the past 7 years and has now been completely removed form all control of the company.

53.     Recently, the Skindilias Trust received notice of a meeting of the Members of Eggspectation to approve the merger offer of another entity entirely comprised of the other Members of Eggspectation. The Revised Merger mandates that the Skindilias Trust be forced out of Eggspectation upon payment to the Skindilias Trust for its 30.375% Membership Interest in Eggspectation by way of a squeeze-out merger between Eggspectation and Eggs Merger with no consideration given to the divestiture of assets from Eggspectation, the capital investments made by the Skindilias Trust to Eggspectation, the sale of Eggspectation Membership Interests or purchase offers related to Eggspectation's affiliate entities.

54.     The Skindilias Trust filed its objection to the proposed merger with Eggs Merger, and it did not vote in favor of the merger.

55.     Within 20 days after the Articles of Merger between Eggspectation and Eggs Merger were accepted by the Maryland Department of Assessment and Taxation, the Skindilias Trust made written demand for payment of its Class B Interests representing a 30.375% Membership Interest in Eggspectation.

56.     Within 50 days after the Articles of Merger were accepted by the Maryland Department of Assessment and Taxation, the Skindilias Trust brings this Petition for Appraisal pursuant to the Maryland Code of Corporations and Associations Section 3-208.

WHEREFORE, the Skindilias Trust demands a fair appraisal of its Membership Interests in Eggspectation of 30.375%, which was wrongfully devalued prior to the squeeze-out merger between Eggspectation and Eggs Merger.

## COUNT II

### (Breach of Fiduciary Duty – The Controlling Eggspectation Members, Directors and Officers of Eggspectation)

57.     The preceding paragraphs are incorporated as though fully set forth herein.

58.     As the Members holding and controlling the overwhelming majority interests in Eggspectation, the Controlling Eggspectation Members, in their capacity as majority interest holders, owed a fiduciary duty to the Skindilias Trust, a minority interests holder, and possessed a fiduciary obligation to not detrimentally interfere in Eggspectation's business operations, refrain from self dealing with respect to the Members' Interests, not engage in self-dealing with respect to the Eggspectation's intellectual property and not otherwise treat Eggspectation

unfairly and inequitably, including, without limitation, devaluing the Skindilias Trust's Membership Interest in Eggspectation to a fraction of its true value.

59.     The Directors and Officers of Eggspectation, in their capacity as directors and officers, owed a fiduciary duty to the Skindilias Trust, an interest holder, and possessed a fiduciary obligation to not detrimentally interfere in Eggspectation's business operations, refrain from self dealing with respect to the Members' Interests, not engage in self-dealing with respect to the Eggspectation's intellectual property and not otherwise treat Eggspectation unfairly and inequitably, including, without limitation, devaluing the Skindilias Trust's Membership Interest in Eggspectation to a fraction of its true value.

60.     The Controlling Eggspectation Members, Directors and Officers of Eggspectation breached all of these fiduciary obligations by, among other things:

a.     Detrimentally interfering with Eggspectation's business operations, its management and personnel;

b.     Engaging in self dealing with respect to the diversion of Eggspectation's assets to entities which they control; and

c.     Devaluing Eggspectation and devaluing the Skindilias Trust's Membership Interest in Eggspectation.

61.     The actions described above constitute gross breaches of fiduciary obligations owed by the Controlling Eggspectation Members, the Directors and the Officers of Eggspectation to the Skindilias Trust. These actions were done with actual malice, without legal justification or excuse, were influenced or motivated by bad intent, spite, oppression, fraud and/or with the intent to deliberately deceive and injure the Skindilias Trust.

62.     As a consequence and direct result of the breaches of fiduciary duties by the Controlling Eggspectation Members, Directors and Officers of Eggspectation, the Skindilias Trust has suffered damages.

WHEREFORE, the Skindilias Trust demands judgment against the Controlling Eggspectation Members, Directors and Officers of Eggspecation joint and several, for compensatory damages in an amount of at least One Million Five Hundred Thousand Dollars ($1,500,000); punitive damages in an amount to be determined at trial of this matter; attorney's fees and costs; and such other relief that this Court may deem to be just and appropriate.

## COUNT III

### (Unjust Enrichment – All Defendants)

63.     The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

64.     Due to the acts of the Controlling Eggspectation Members, those individuals controlling these Member entities, Eggspectation and its Directors and Officers, Skindilias has been replaced as the President of Eggspectation and all of the Controlling Eggspectation Members' interests have been unlawfully and unjustly enriched by diverting assets away from Eggspectation, to the detriment of Eggspectation, without the consent or permission of the Skindilias Trust and without paying Skindilias any of the compensation he was owed as an Officer or honoring the significant capital advances that the Skindilias Trust has made to Eggspectation.

WHEREFORE, the Plaintiffs demand judgment against the Defendants, joint and several, for compensatory damages in an amount of at least One Million Five Hundred Thousand Dollars

($1,500,000); punitive damages in an amount to be determined at trial of this matter; attorney's

fees and costs; and such other relief that this Court may deem to be just and appropriate.

Respectfully submitted,

Martin H. Schreiber II (Fed Bar No. 22886)
Law Office of Martin H. Schreiber II, LLC
3600 Clipper Mill Road, Suite 201
Baltimore, MD 21211
Tel:  410-366-4777
Fax: 410-510-1574
Email: mhs@schreiber-law.com

*Local Counsel for Plaintiffs,*
*The Jimmy Skindilias Family Trust, Mavra*
*Toufidis and Jimmy Skindilais*

Barry L. Cohen*
Royer Cooper Cohen Braunfeld LLC
101 West Elm Street, Suite 220
Conshohocken, PA 19428
Tel: 484-362-2620
Fax: 484-362-2630
Email:  bcohen@rccblaw.com

*Lead Counsel for Plaintiffs,*
*The Jimmy Skindilias Family Trust, Mavra*
*Toufidis and Jimmy Skindilais*

* *Pro Hac Vice Pending*

20